**FILED & ENTERED**

MAY 21 2019

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY craig    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>Terry Lee Fleming, Sr<br><br><br><br><br><br><br><br>Debtor(s). | Case No.: 6:17-bk-19513-MW<br><br>CHAPTER 11<br><br>**MEMORANDUM DECISION AND ORDER**<br><br>Dates: April 25, 26, and 30, 2019<br>Time: 9:00 AM<br>Place: <u>Riverside Division</u><br>3420 Twelfth Street<br>Courtroom 225<br>Riverside, CA 92501<br>-or-<br><u>Santa Ana Division</u><br>411 W Fourth Street<br>Courtroom 6C<br>Santa Ana, CA 92701 |

Martin A. Eliopulos, Esq. for Havasu Lakeshore Investments, LLC

Gregory M. Garrison, Esq. for Havasu Lakeshore Investments, LLC

Michael B. Reynolds, Esq. for Terry Lee Fleming, Jr. and Havasu Landing, LLC

Grant G. Teeple, Esq. and Frederick M. Reich, Esq. for Havasu Lakeshore Investments, LLC

James E. Till, Esq. for the Debtor and Debtor-in-Possession

**WALLACE, J.**

This matter comes before the Court on the request of debtor Terry Lee Fleming, Sr. ("Mr. Fleming") for confirmation of his Second Amended Chapter 11 Plan of Reorganization Dated November 1, 2018, Docket No. 212, filed November 1, 2018 (the "Plan").  The Court held plan confirmation hearings for three full days on April 25, 26 and 30, 2019.  All direct testimony was by declaration, except in the case of hostile witnesses.

Mr. Fleming filed his chapter 11 petition on November 15, 2017.  His amended schedules show total assets of $5,931,985.78 and total liabilities of $5,029,756.03.  His bankruptcy filing was largely precipitated by aggressive collection action by the largest creditor in the case, Havasu Lakeshore Investments, LLC ("HLI").

HLI holds a California state court judgment against Mr. Fleming for constructive fraud and punitive damages that, as of the petition date, amounted to $4,713,037.20, including attorneys' fees and interest at 10 percent per annum accruing from the February 11, 2015 judgment date.  HLI contends that, as of December 31, 2018, its claim based upon this judgment, attorneys' fees, prepetition and post-petition interest is $5,125,089.36.  HLI further contends that, as of April 30, 2019, it is owed $5,399,622.69 in respect of these items.

The Plan proposes to pay all creditors (including HLI) in full over a period of approximately five years.  With the sole exception of HLI, all creditors either voted in favor of the Plan or failed to vote.  HLI opposes confirmation of the Plan.  Because HLI's secured claim is impaired and is placed in a separate class, the Plan fails to satisfy the requirements of 11 U.S.C. § 1129(a)(8) (a point that is not disputed by either Mr. Fleming or HLI).  Thus, if the Plan is to be confirmed, it can only be confirmed through cramdown under 11 U.S.C. § 1129(b) (also a point not disputed by any party).

One of Mr. Fleming's major assets is a 45 percent interest in Havasu Landing, LLC ("Landing").  The remaining 55 percent interest in Landing is held by Terry Lee Fleming, Jr., Mr. Fleming's son ("TLF").  Landing's primary asset is an approximately 80-acre manufactured home park named "Vista Del Lago" on the California side of Lake Havasu. Other real property assets of Landing, in the same general vicinity of Vista Del Lago, are a

2.26 acre vacant commercial lot, the Vista Storage property, comprised of 47 units covering 22,165 square feet in two different buildings and a 2.6 acre vacant self-storage lot.  Landing has been selling lots at Vista Del Lago since approximately 2015.

The Plan classifies HLI's claims against Mr. Fleming as a secured claim in Class One based upon the security interests HLI has asserted.  Mr. Fleming is challenging HLI's security interests in a related adversary proceeding, but the Plan's provisions effectively assume HLI's claim is fully secured.  Further, the Plan expressly provides that "[f]or the avoidance of doubt, no lien is being stripped by virtue of the Plan."  Under the Plan, HLI is paid $500,000.00 in cash on the Plan's effective date and receives from Landing a conveyance of 46 individual lots in Phase One of Vista Del Lago plus three turn-key finished home sites, such distributions to be made by quit-claim deed within 10 business days of the effective date.  Mr. Fleming estimates that after these cash and in-kind payments, HLI's secured claim will be reduced to approximately $846,900.  In respect of this amount, HLI will receive under the Plan five annual payments of approximately $191,784 each at 5 percent per annum interest.

## HLI'S OBJECTIONS TO PLAN CONFIRMATION

HLI's statement of facts in its objection to Plan confirmation accuses Mr. Fleming of an entire series of prepetition bad acts such as hiding assets, making fraudulent transfers, etc.  Mr. Fleming contends that HLI's version of events is false or, at least, misleading.  Some of these matters are the subject of pending adversary proceedings in this Court.  The Court will address HLI's factual contentions insofar as they have a bearing on Bankruptcy Code requirements for confirming a chapter 11 plan of reorganization and otherwise will leave them for determination in the pending adversary proceedings or in some other forum.

HLI's objections to Plan confirmation fall into five general categories: (1) the Plan was not proposed in good faith, (2) the Plan fails to meet the best interests of creditors test; (3) the Plan is not feasible; (4) the Plan is not fair and equitable; and (5) the Plan unfairly discriminates against HLI.  Although these objections vary, the factual underpinning of most of them is that HLI is being seriously short-changed in terms of the distributions it is to receive

under the Plan and, contrary to Mr. Fleming's contentions, its secured claim is most definitely <u>not</u> being paid in full. HLI's central argument is that the 46 individual lots and three finished turn-key homesites it is scheduled to receive within 10 days of the effective date are worth only a small fraction of what Mr. Fleming contends they are worth, resulting in the Plan's inability to satisfy the "fair and equitable" requirement of 11 U.S.C. § 1129(b)(2)(A). In rebuttal, Mr. Fleming asserts that HLI is realizing the "indubitable equivalent" of its claim under 11 U.S.C. § 1129(b)(2)(A)(iii), thereby satisfying the requirements of the statute. The Court will address this issue first.

### 1. Is the Plan fair and equitable?

A chapter 11 plan cannot be confirmed through cramdown unless it is fair and equitable and does not discriminate unfairly with respect to each class of creditors and interest holders who are impaired by the plan yet have not accepted it. 11 U.S.C. § 1129(b)(1). The heart of the "fair and equitable" requirement with respect to impaired, non-consenting secured creditors is found in 11 U.S.C. § 1129(b)(2)(A), which requires that one of three requirements be met: (1) the holders retain their liens and receive total cash payments totaling at least the allowed amount of their claims, of a value, as of the effective date, at least equal to the value of such holder's interest in the estate's interest in such property; (2) if property subject to liens securing claims is to be sold under 11 U.S.C. § 363(k) free and clear of such liens, liens attach to the sales proceeds and such liens are treated under (1) above or (3) below; or (3) the holders realize the "indubitable equivalent" of their secured claims. Mr. Fleming contends that the Plan satisfies the requirements of 11 U.S.C. § 1129(b)(2)(A) because HLI is realizing the "indubitable equivalent" of its claim.

The United States Court of Appeals for the Ninth Circuit (the "Ninth Circuit") addressed indubitable equivalence in *Arnold & Baker Farms v. United States ex rel. United States Farmers Home Admin. (In re Arnold & Baker Farms)*, 85 F.3d 1415 (9th Cir. 1996), *cert. denied,* 519 U.S. 1054 (1997). In that case, Farmers Home Administration ("FmHA") held a second and subsequently a first deed of trust on 1,320 acres of land securing a loan of about

$3.8 million. Debtor Arnold & Baker Farms ("A & B") proposed a plan of reorganization giving FmHA 566.5 acres from this 1,320 acre tract in full and complete satisfaction of its claim and stripping the lien from the balance. The bankruptcy court determined the value of the 566.5 acres to be $7,300 per acre. On this basis, the bankruptcy court determined that FmHA had been paid in full and that the indubitable equivalence requirement was satisfied.

The Ninth Circuit, reviewing a Ninth Circuit Bankruptcy Appellate Panel (the "BAP") decision reversing the bankruptcy court, affirmed the BAP. The Ninth Circuit determined that the material and substantial alteration of FmHA's collateral increased its risk exposure, and such increased risk exposure resulted in a lack of indubitable equivalence. Prior to the transaction, FmHA could look to its security interest in 1320 acres to satisfy its claim. After the transaction, although it owned 566.5 acres outright, it had lost its security interest in the remaining 753.5 acres. The Ninth Circuit framed the indubitable equivalence test as follows: "To the extent a debtor seeks to alter the collateral securing a creditor's loan, providing the 'indubitable equivalent' requires that the substitute collateral not increase the creditor's risk exposure." 85 F.3d at 1422. *See also In re McClure,* No. 1:13-bk-10386-GM, 2015 Bankr. LEXIS 1076 *18 (Bankr. C.D. Cal., April 2, 2015) (Mund, J.): "The Ninth Circuit has held that 'indubitable equivalence' allows alteration of collateral if it does 'not increase the creditor's risk exposure.'" [citing *Arnold & Baker Farms,supra* ].

In the case at bar, as previously stated, the Plan expressly provides that no liens are being stripped. Although an adversary proceeding is now underway in which Mr. Fleming is challenging the extent of HLI's security interests and liens, the Plan classifies HLI's claim as a fully secured claim in its entirety. Importantly, the 46 lots and three finished homesites being transferred to HLI under the Plan are owned by Landing – not by Mr. Fleming -- and are not subject to HLI's security interests or liens.

In assessing whether the Plan satisfies the indubitable equivalence requirement, the Court will examine the following: (1) the extent to which HLI's claim is being paid in full through the $500,000 cash payment on the effective date, a conveyance of 46 lots and three finished homesites in Vista Del Lago within ten business days after the Plan's effective date

plus a stream of five annual payments of $191,784 each at five percent per annum interest; and (2) whether HLI's risk exposure has been increased as a result of Plan provisions.

### A. HLI's Claim and Its Proposed Satisfaction in Full Under the Plan

For purposes of analyzing indubitable equivalence, the Court accepts HLI's contention and supporting calculations that, as of April 30, 2019, its claim is $5,399,622.69.[1]

Mr. Fleming argues that the 46 lots plus three finished homesites have a fair market value of $3,753,000 or more. Adding in the $500,000 cash payment on the Plan effective date and the stream of five annual payments of $191,784, the total is $5,211,920. Mr. Fleming through his attorney acknowledged at the Plan confirmation hearing that a shortfall might occur and consented to an increase in the five annual payments to make up the difference.

HLI contends it is not receiving anything close to $5,211,920 in terms of value. Its main argument is that the 46 lots and three finished homesites are really worth millions of dollars less than Mr. Fleming contends they are worth. It is to this key issue that the Court now turns.

### B. The Fair Market Value of the 46 Lots and Three Finished Homesites

Mr. Fleming and HLI each relies upon expert testimony to support their respective valuations of the 46 lots and three finished homesites. Mr. Fleming's expert is Michael J. Vanderley; HLI's expert is Rob Detling. The Court heard extensive live testimony from Messrs. Vanderley and Detling over a number of days.

Mr. Detling greatly disagreed with the Plan's assignment of a value of $3,753,100 to the 46 lots and three finished homesites. He developed two financial projection models, each involving a projected sales of the lots over an extended period of time, and concluded that, after applying time value of money principles to the stream of cash flows resulting from the

---

[1] If Mr. Fleming is successful in challenging HLI's security interests in the adversary proceeding, it is possible that HLI would lose its entitlement to include post-petition interest of about $582,000 in its claim. *Compare* 11 U.S.C. § 502(b)(2) *with* 11 U.S.C. § 506(b). Nothing in this Memorandum Decision is intended to imply that the Court is foreclosing Mr. Fleming's rights in this regard.

sale of lots, the fair market value of the 46 lots and three finished homesites ranged between $443,743 on the low side and $1,384,628 on the high side.

The Court finds that Mr. Detling's testimony is materially lacking in credibility based upon both the quality of his analysis and his demeanor on the witness stand. One of his two models projects that it will take HLI 24 years – nearly a quarter of a century – to sell the 46 lots and three finished homesites. He then discounts the cash flows over the 24 years to present value at 20 percent per annum to arrive at a net present fair market value of $443,743. (14 percent and 17 percent discount rates are also used). When first presented with this analysis, the Court found it hard to believe that HLI (or any developer for that matter) would need 24 years to sell 46 residential lots. The discussion below confirms that the Court's skepticism is well-founded.

Mr. Detling's 24 years-to-sell model is based upon the assumption that the market will bear only four lot sales per year and that, because HLI will be in competition with Landing (who according to Mr. Detling will be developing and selling lots from Phase Two of Vista Del Lago), HLI will be able to sell only two lots per year. However, as TLF's counsel aptly pointed out, there is no reason to believe that Landing will go to the trouble and expense of developing Phase Two if it is able to sell only two lots per year for the indefinite future.[2] Using Mr. Detling's analysis, a 100-lot Phase Two project would take Landing about half a century to sell.

The four lots per year rate of sale that Mr. Detling uses is based upon a poor rate of sales during the 2016-2018 period. This was a period when Mr. Fleming's son, TLF, was saddled with two less-than-effective real estate agents, each of whom he eventually fired for poor sales performance. It was also a period where Vista Del Lago was under the cloud of continuing litigation between HLI and Mr. Fleming. In contrast, Landing sold 23 lots in Vista Del Lago in 2015. Mr. Detling gave little or no weight to the 2015 sales performance in his

---

[2] 3 Reporter's Transcript ("R.T."), April 30, 2019 at 224, lines 6-11: "His [i.e., Mr. Detling] assumptions about competition from phases two and three are incorrect. If what he's saying about sales velocity is correct, then phases two and three are going to take over 100 years to build out . . . . Nobody is going to provide him competition in that case."

models; instead, he cherry-picked the 2016-2018 period. HLI argues that the sale of 23 lots in 2015 is not representative because manufactured homes were already in place on the lots at that time (with the land being leased from Landing) and that Landing had a built-in customer base. The Court finds this unpersuasive because the persons who bought in 2015 were under no compulsion to buy and, if they had so chosen, could have continued to lease their land – an option exercised by a significant number of the owners of manufactured homes in Vista Del Lago. The Court does not regard it as valid to disregard these sales in their entirety, as Mr. Detling does in his financial projection models.

Mr. Detling's use of a 20 percent discount rate in his financial models is also suspect. He developed his estimate of a 20 percent per annum rate from a PwC Real Estate Investor Survey for the Second Quarter of 2018 (the "Survey") (admitted as Exhibit 83). The Survey largely relates to and discusses office buildings, regional malls, strip centers, apartment buildings, and warehouses. Non-apartment residential is covered in a section entitled "National Development Land Market—Select Survey Responses." <u>Importantly, the Survey does not cover manufactured home communities such as Vista Del Lago at all.</u> Declaration of Michael J. Vanderley in Support of Confirmation of Debtor's Second Amended Chapter 11 Plan of Reorganization Dated November 1, 2018, Docket No. 259, filed December 20, 2018 (the "Vanderley Declaration") at page 10 of 28, lines 2-3. The Survey ascribes a 20 percent discount rate to cash flows from "single family-luxury" projects whose "value of land under development ranges from $200 million to $1 billion" and whose "preferred absorption" ranges from 11 to 20 years. "Marketing period" is described as 12 to 36 months. Mr. Detling explained that "Marketing period" describes the time to sell out a single component or phase of the project.[3] These numbers and details indicate that the Survey is referring to massive residential real estate development projects in many phases over many years whose land value ranges anywhere <u>from 50 to 400 times</u> the value of the 46 lots and three finished homesites at issue here (assuming for purposes of calculation a round number value of $4 million) – and which do not involve manufactured homes. This is hardly a comparable for

---

[3] 3 R.T. at 111, lines 15-25, 112 at lines 1-18.

Vista Del Lago. Moreover, the Survey shows that as multi-phase residential projects get smaller (in terms of land value) and preferred absorption periods become shorter, the discount rate actually goes <u>down</u> – Single family-residential where the land value is "up to $100 million" with a preferred absorption period of 6 to 10 years is shown to carry a discount rate between 16 and 18 percent. The Survey does not have a separate category for small projects such as Vista Del Lago whose value is under $5 million. The use of a 20 percent discount rate is very advantageous in terms of depressing the net present value of a stream of payments from the sale of lots, but its use here is not credible given that it is based upon data for projects that are enormously dissimilar to Vista Del Lago. The use of 14 percent and 17 percent discount rates are less advantageous to HLI but are no more supported than the 20 percent rate because of the absence of a true comparable.

Mr. Detling also has a financial model involving a 12-year sell out period for the 46 lots and three finished homesites in which lots are sold by HLI at the rate of four per year. This model is slightly less extreme than the 24-year sell out model (described by Mr. Detling as "pessimistic" and "worst case"). However, like the 24-year model, it assumes a discount rate of 14 percent, 17 percent and 20 percent and, by limiting the assumption to four sales per year, disregards the 23 lots sold in 2015. This financial projection model is no more credible than the 24-years-to-sell-46-lots model.

Mr. Detling's analysis suffers from numerous other infirmities, such as assuming a front-loading of expenses and a backloading of cash flows from the sale of lots, Vanderley Declaration at pages 10-11 of 28, and patently incorrect assumptions with respect to the costs associated with selling lots, Vanderley Declaration at page 8 of 28, lines 10-15.

The Court concludes that the Detling analysis is materially lacking in credibility and entitled to no weight in determining the fair market value of the subject property.

In contrast, Mr. Vanderley's analysis does not backload cash flows, make unfounded assumptions about the cost of selling lots or cherry-pick time periods. He takes into account <u>both</u> the 2015 period <u>and</u> the 2016-2018 period in determining his estimate of the current fair market value of the 46 lots and three finished homesites. Mr. Vanderley relied upon both the

Survey and a subsequent PwC survey (not admitted into evidence) for the fourth quarter of 2018.  Although the Survey would not have been helpful for the reasons stated above, the fourth quarter 2018 report may have contained additional data that was in fact useful and reliable.  Mr. Vanderley calculated the fair market value of the 46 lots and three homesites using a six-month and nine-month sales cycle.  So determined, and taking into account the costs of holding and selling these properties, Mr. Vanderley projected a range of sales proceeds (excluding future appreciation) between $3,694,000 and $3,737,000.[4]

      Initially, the Court was surprised that neither Mr. Detling nor Mr. Vanderley used a bulk sale approach in determining fair market value (i.e., a single sale of all 46 lots and three finished homesites to a single buyer in a single transaction).  Mr. Vanderley explained that a bulk sale would be essentially a liquidation (not conducive to obtaining the best price for the property) whereas a marketing approach entailing the sale of individual lots would be commercially reasonable.  The Court is satisfied with this explanation, and it is telling that neither one of Mr. Detling's financial projection models follows the bulk sale approach.  Commercially unreasonable sales cannot be expected to yield the full fair market value of property.  An extreme example of this would be selling the Hope Diamond at a garage sale.

      As stated earlier, in order for the Plan to be crammed down, HLI must realize the indubitable equivalent of its claims.  "Indubitable" means too evident to be doubted.  *Arnold & Baker Farms v. United States ex rel. United States Farmers Home Admin. (In re Arnold & Baker Farms)*, *supra,* 85 F.3d at 1421.  To avoid doubt, and therefore satisfy indubitable equivalence, the Court will use the lower of Mr. Vanderley's valuations, namely $3,694,000, in determining the total amount of value necessary to deliver to HLI to ensure that HLI realizes the indubitable equivalent of its claim.

---

[4] This model excludes any potential future price appreciation.  Mr. Vanderley also prepared financial models using potential future price appreciation but did not put stock in them, regarding them as "the real estate functional equivalent of a crystal ball."  2 R.T. at 192, lines 11-12.  These models did not sway him from his belief that aggregate value was around $3.7 million.  2 R.T. at 192, lines 6-7: "Well, you touch on a great point, Your Honor.  I mean, the $3,700,000.  I mean that's the aggregate value."  *See also* 2 R.T. at 154, lines 7-10.

### C. Total Consideration Under the Plan to HLI and Indubitable Equivalence Requirements

Total consideration under the Plan to HLI will consist of the $500,000 cash payment on the Plan's effective date, a conveyance of 46 lots and three finished homesites by Landing to HLI within 10 days of the effective date, such conveyance having a value of $3,694,000, and a stream of five annual payments bearing interest at a market rate. The Plan had proposed that the periodic payments over five years should be $191,784 each, but this number is too low to pay HLI in full as the Plan promises (and effectively is required under indubitable equivalence principles) to do. As invited by Mr. Fleming's counsel, the Court will adjust upward the principal balance of HLI's claim that is being paid over five years.

Thus, total consideration to HLI will consist of $500,000 on the Plan effective date, 46 lots and three finished homesites whose value is pegged at $3,694,000 and five annual periodic payments of $241,124.54 each at 5 percent per annum interest[5] (i.e., a total of $1,205,622.69 in deferred payments plus 5 percent per annum interest over 5 years).

### D. HLI's Collateral Position After the Plan Effective Date

*Arnold & Baker Farms* teaches that the "indubitable equivalence" requirement cannot be satisfied if a creditor's risk exposure is increased by a substitution of collateral. "To the extent a debtor seeks to alter the collateral securing a creditor's loan, providing the 'indubitable equivalent' requires that the substitute collateral not increase the creditor's risk exposure." *Arnold & Baker Farms v. United States ex rel. United States Farmers Home Admin. (In re Arnold & Baker Farms)*, supra, 85 F.3d at 1422.

---

[5] HLI argues that the 5 percent interest rate it is being paid on the amount deferred over five years violates the "fair and equitable" test because it contravenes the requirements of 11 U.S.C. § 1129(b)(2)(A)(i)(I). However, Mr. Fleming is not seeking cramdown under 11 U.S.C. § 1129(b)(2)(A)(i)(I) (which incorporates a present value requirement), he is seeking it under 11 U.S.C. § 1129(b)(2)(A)(iii). Even if "indubitable equivalence" is regarded as incorporating the same interest rate standards as 11 U.S.C. § 1129(b)(2)(A)(i)(I) – a not unreasonable interpretation – the Court regards the 5 percent rate being paid as a market rate given HLI's oversecured position with respect to approximate $1.2 million balance. HLI will be oversecured even if it loses the adversary proceeding and is secured only by the springing security interests in the Carmel Property and the Del Dios Property. If it prevails in the adversary proceeding, it will be even more oversecured. Indeed, in that event it would be vastly oversecured.

There is no alteration of HLI's collateral under the Plan: the Plan expressly provides that no liens are stripped. Although an adversary proceeding is pending in which Mr. Fleming seeks a determination by this Court that HLI's security is less than what it has asserted, the Plan goes on to provide that even if the Court were to decide in such adversary proceeding that HLI's claim is completely unsecured, a security interest in the Carmel Property would spring into existence and would secure the obligation to make five annual periodic payments plus interest to HLI.

With one caveat, the Court concludes that this arrangement satisfies the indubitable equivalence test. After the Plan goes effective, HLI retains all its existing security interests in Mr. Fleming's property – every single last piece of it – because no liens are stripped. Even if the Court decides in the adversary proceeding that HLI has no security interests at all (a most unlikely outcome given the facts of this case), the security interest in the Carmel Property would spring into existence and provide security to HLI.

The caveat involves the necessary amount of security to backstop the right to receive the five annual periodic payments. The Carmel Property has a value estimated on the low side to be $1,052,000 and on the high side to be $1,162,185. This is insufficient to secure a claim of $1,205,622.69. To make up the shortfall, the Court will require Mr. Fleming to provide HLI with a springing security interest (such as the one provided in the Carmel Property) in the Del Dios Property (liquidation value $460,000). Thus, even in a worst-case scenario in which HLI loses all its security interests as a result of the pending adversary proceeding, HLI will nevertheless have collateral having a fair market value ranging between $1,512,000 and $1,622,185 through the springing security interests to secure principal payments of $1,205,622.69. The springing security interests will provide HLI with adequate protection in the form of an equity cushion ranging between roughly 25 percent and 35 percent. *In re Mellor,* 734 F.2d 1396, 1400-01 (9th Cir. 1984) (20 percent equity cushion generally is sufficient to provide adequate protection).

The analysis above demonstrates that HLI will realize the indubitable equivalent of its claims, thereby satisfying the "fair and equitable" requirement of 11 U.S.C. § 1129(b)(2).

**2.  Is the Plan proposed in good faith?**

11 U.S.C. § 1129(a)(3) requires that the "plan has been proposed in good faith and not by any means forbidden by law."  In assessing whether these requirements have been met, a bankruptcy court must inquire into the totality of the circumstances.  *In re City of Stockton, California*, 542 B.R. 261, 279 (B.A.P. 9th Cir. 2015).  A bankruptcy court has discretion in deciding whether the plan has been proposed in good faith, with the most important feature being an inquiry into the plan's fundamental fairness.  *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001).  One court has stated that to be proposed in good faith, a chapter 11 plan must have a true purpose and fact-based hope of either preserving a going concern or maximizing property available to satisfy creditors.  *In re Multiut Corp.*, 449 B.R. 323 (Bankr. N.D. Ill. 2011).

Another court has asked whether the plan proponent (here, Mr. Fleming) has shown that there was fundamental fairness to creditors.  *In re Washington Mutual, Inc.*, 461 B.R. 200, 239 (Bankr. D. Del. 2011), *vacated in part on other grounds*, 2012 Bankr. LEXIS 895 (Bankr. D. Del. 2012).

HLI argues that Mr. Fleming is continuing his prepetition conduct in dodging payment of HLI's claim through the means of the Plan, namely, by shifting "the risk of default to HLI while paying only pennies on the dollar to its Clas [sic] 1 Secured Claim."  Objection of Havasu Lakeshore Investments, LLC To:  Debtor's Second Amended Chapter 11 Plan of Reorganization Dated September 14, 2018, Docket No. 238, filed December 3, 2018 (the "HLI Objection"), at page 25 of 39, lines 27-28.  HLI complains that it is receiving a distribution of only $500,000 in cash and a collection of over-valued lots, and then is being made to wait five years to be paid the $846,900 balance.

The Plan satisfies all the requirements of being proposed in good faith.  It is fundamentally fair:  all creditors are being paid in full.  HLI disagrees that it is being paid in full, but the analysis above shows that HLI is realizing the indubitable equivalent of its claims.  The Plan preserves Mr. Fleming's going concern (through Landing, in which he continues to hold a 45 percent interest).  No "risk of default" under the Plan is being shifted to HLI.  HLI is

having over three-quarters of its entire claim paid within 10 days of the effective date, with the balance being paid in full in cash over five years with a market rate of interest.

HLI's final argument under the good faith rubric is that the Plan preserves Mr. Fleming's rights of set off and recoupment against HLI.  *See* Plan at page 25 of 43, lines 7-15.  This Plan provision mentions HLI but does not describe any specific right of set off or recoupment against HLI or anyone.  Set off or recoupment rights are preserved only if they exist, and the Court fails to see how a debtor's preservation of existing rights somehow constitutes bad faith.

### 3.  Does the Plan satisfy the best interests of creditors test?

11 U.S.C. § 1129(a)(7) requires that with respect to each impaired class of claims or interests, each holder thereof must have either accepted the plan or, alternatively, will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  HLI argues that the Plan fails this requirement because it will realize only $443,743 to $544,429 from the lots and homesites conveyed to it, not over $3 million as contended by Mr. Fleming.  Because HLI has security interests in property worth over $5.5 million (according to HLI), it would be paid in full in a chapter 7 liquidation, whereas it is not being paid anywhere close to the amount it is owed under the Plan.

As discussed above, HLI is being paid the full amount of its claim.  It could not do any better in a chapter 7 liquidation.  Mr. Fleming has shown to the Court's satisfaction that HLI is receiving considerably more under the Plan than it would in a chapter 7 liquidation. The best interest of creditors test is satisfied.

### 4.  Is the Plan feasible?

Under 11 U.S.C. § 1129(a)(11), a bankruptcy court can confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further reorganization, of the debtor or any successor to the debtor . . ."  Feasibility is interpreted to

mean not an absolute, iron-clad guaranty of success but only a reasonable probability of success. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1364 (9th Cir. 1986).

HLI contends the Plan is not feasible because it is unlikely HLI will be able to sell 46 vacant lots in less than 12 to 24 years. The Plan's terms do not hinge upon the amount of time it takes HLI to sell the 46 lots and three finished homesites HLI will receive under the Plan. Mr. Fleming has shown that he possesses the necessary amount of cash to make payments to creditors (including but not limited to HLI) on or about the effective date. Landing has consented to the Plan and to the conveyance of 46 lots and three finished homesites to HLI. There is no doubt that Landing is ready, willing and able to make the necessary distributions of lots and finished homesites to HLI that are required under the Plan. These considerations show that the Plan is feasible within the meaning of *Acequia.*

Additionally, HLI argues that the Plan isn't feasible because it fails to account for the possibility that HLI might win its fraudulent transfer action against TLF with the result that the entirety of Vista Del Lago would be property of the estate and that HLI could then foreclose and thereby ensure payment in full. Even if HLI wins the fraudulent transfer action and forecloses on the entirety of Vista Del Lago, it will not receive any more money or value than it receives under the Plan because its claim is being paid in full under the Plan as shown above.

The Court concludes that the Plan is feasible.

**5. Does the Plan violate the prohibition against "unfair discrimination"?**

Part and parcel of the rules relating to cramdown is a prohibition against unfair discrimination. 11 U.S.C. § 1129(b)(1). A chapter 11 plan is permitted to discriminate – discrimination is often necessary to satisfy rules regarding the treatment of secured and priority creditors – but it cannot do so "unfairly." Generally, the unfair discrimination standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly-situated classes. *In re Armstrong World Industries, Inc.*, 348 B.R. 111, 120 (D. Del. 2006); *Matter of Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd,* 78 B.R. 407

(S.D.N.Y. 1987), *aff'd,* 843 F.2d 636 (2d Cir. 1988).

HLI complains that the Plan discriminates unfairly because it is the only secured creditor whose collateral is being used to finance the Plan. Whether HLI's collateral is being used to finance the Plan will depend upon the outcome of the adversary proceeding challenging HLI's security interests. But even if it is assumed for purposes of analysis that HLI will prevail in that adversary proceeding, it does not follow that HLI is being treated unfairly as compared with other creditors. All creditors are being paid in full, so there is no unfair discrimination on that front. In terms of the timing of payments, HLI fares <u>better</u> than just about every creditor class other than administrative and convenience classes. HLI is, after all, being paid about 77 percent of its claim on or before ten days after the effective date. In contrast, the Internal Revenue Service, California Franchise Tax Board and Riverside County Treasurer and Tax Collector are being paid over a period of 5 years from the petition date, which translates into approximately three and one half years after the Plan's effective date. It will take these parties at least two years from the effective date to be paid the same percentage of their respective claims that HLI is receiving within ten days of the effective date. The secured claims of J. Victor Construction Co. and Katherine Doucette are being paid on close to the same schedule as the taxing authorities. The same holds true with respect to the class of general unsecured creditors.

Applying the analysis from the opposite perspective, the Plan does not unfairly discriminate against the taxing authorities, J. Victor Construction Co., etc. because the size of HLI's claim and the blanket security interests it allegedly holds makes it materially unlike any other creditor or creditor class in this case.

The Court concludes that the Plan does not unfairly discriminate.

## CONCLUSION

For the reasons stated above, the Court overrules HLI's objections and determines that all requirements for confirmation of the Plan have been satisfied. Mr. Fleming shall lodge (1) findings of fact and conclusions of law, and (2) a confirmation order within twenty (20)

days of the date of entry of this Memorandum Decision and Order.  Each such lodged pleading shall be consistent with this Memorandum Decision and Order.

IT IS SO ORDERED.

###

Date: May 21, 2019

Mark S. Wallace
United States Bankruptcy Judge